UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80931-CV-HURLEY/HOPKINS

LENNON ANDERSON,

    Plaintiff,
v.

JILL S. CREECH,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant's Motion for Summary Judgment [ECF No. 72]. The motion is fully briefed, and is ripe for adjudication. For the reasons to follow, the Court will grant the motion and enter judgment in Defendant's favor.

### I. BACKGROUND

This case arises from the termination of Plaintiff's employment at the Southeast District of the Florida Department of Environmental Protection ("DEP") on August 13, 2012. Plaintiff alleges that Defendant Jill Creech's decision to terminate his employment was impermissibly motivated by racial animus. Defendant denies this claim and asserts that her decision to terminate was a justified personnel action based on her belief that Plaintiff lacked adequate management skills.

    *A.    Events Leading Up to Plaintiff's Termination*

Plaintiff began working at the DEP on November 2, 1992, eventually being appointed the Program Administrator ("PA") for the Air Program in the Southern District on January 4, 2009. As PA, Plaintiff led the program and supervised its staff of approximately ten employees. Defendant,

meanwhile, became the Director of the Southeast District on May 31, 2011, in which role she supervised Plaintiff.

In response to government initiatives indicating a need for increased efficiency, in early 2012 Plaintiff designed and implemented an "SED Air Dashboard" as a means to measure and evaluate his subordinates' use of time. The Dashboard required workers to log their time—weekly, at first, and then daily for increments of fifteen minutes or more—to account for every task while at work. Plaintiff then reviewed the logs to determine whether any time was unaccounted for and whether workers were spending appropriate amounts of time on each task.

It was around this time, in early 2012, that Air Program staff began to voice complaints about Plaintiff's management style and accountability programs to human resources representatives (specifically, Nancy Delosantos) and Plaintiff's superiors (specifically, Kevin Claridge, who was at that time the assistant director of the Southeast District). Claridge responded to these complaints by working with Plaintiff to improve his management style—e.g., by encouraging him to relax the time-tracking requirements and to communicate in person rather than in "long strings of unproductive e-mails." Motion Ex. G, 2-3 [ECF No. 72-3, at 12-13]. Claridge was eventually promoted to another position on June 25, 2012.

Throughout July of 2012, Plaintiff questioned two of his subordinates—Lee Hoefert and Nicole Stallings—about their use of time in fulfilling job responsibilities and determining whether they were up to date on their Dashboard accountability reports. In response to Plaintiff's questioning, Hoefert and Stallings complained to the main human resources department in Tallahassee on July 24, 2012. Response Ex. 2, ¶ 4 [ECF No. 72-2]. The complaint was assigned

2

to Geraldine Austin, who performed a preliminary investigation that consisted of discussing the matter with the complainants, speaking with Claridge, and reviewing the circumstances surrounding the departures of four of Plaintiff's former subordinates who had left during his tenure. Austin's initial assessment was that Plaintiff had "tak[en] micro-managing to a new level." *Id.* at 9.[1] Before her investigation was complete, Austin notified another human resources officer, Robert Wilson, of Austin's preliminary findings. *Id.* ¶ 4. Wilson then contacted Defendant to report that Human Resources had received the complaint and conducted an investigation that "substantiated the existence of management problems . . . that were affecting employee morale, their ability to effectively perform their work duties and had caused some employees to leave." Response, Ex. 4, ¶ 11 [ECF No. 72-4]. Faced with these issues and in light of her prior efforts to help Plaintiff improve his management skills, Defendant decided to terminate Plaintiff. *Id.* When Austin learned this, she decided it was unnecessary to complete her investigation, but by that time she had already concluded that a stressful environment existed and that Plaintiff's time-reporting requirements were too rigid and no longer necessary. Response Ex. 2, ¶ 4-5 [ECF No. 72-2].

During the time Austin was conducting her investigation and before Defendant had determined to fire Plaintiff, friction continued to exist between Plaintiff and Hoefert and Stallings. On July 26, Plaintiff e-mailed Hoefert to state that he would be issuing Hoefert an official oral reprimand. On the same day, Stallings responded to one of Plaintiff's e-mails asking her about her use of time in a manner Plaintiff perceived as discourteous. Plaintiff sought advice on how to handle

---

[1] This citation refers to the page number in the header at the top of the documents generated by CM/ECF rather than to the internal page numbers at the bottom, which are inconsistent.

Hoefert and Stallings' perceived insubordination from a fellow PA, who stated he did not want to get involved, and from Defendant, who directed Plaintiff to schedule a meeting.

The meeting took place on July 30 and was attended by Plaintiff, Defendant, Hoefert, and another employee.[2] Defendant advised the Air Program employees to resolve the problems they had been having because they would not like the outcome if she had to resolve them herself. 2d Am. Compl. ¶ 98-99 [ECF No. 67]; 2d Am. Compl. Ex. 72 [ECF No. 67-3, at 37]. However, Plaintiff continued to experience problems with Hoefert and Stallings, and on August 1 he met with Delosantos to discuss disciplinary options. Plaintiff first stated that he intended to terminate Stallings, but Delosantos encouraged him to wait until Stallings returned from maternity leave. Plaintiff then decided to issue Letters of Concerns to both Stallings and Hoefert, which is a low form of discipline[3] that falls below issuing an official reprimand. Plaintiff drafted the letters and submitted them to Delosantos and Human Resources Consultant Jessica Cherry in Tallahassee for review.

On August 9, before Plaintiff could issue the Letters of Concern, Defendant scheduled a meeting with Plaintiff and Delosantos for August 13. At the meeting, Defendant informed Plaintiff he was being let go because of his poor leadership skills, his decision to contact Tallahassee about disciplinary action after Defendant had told him to resolve the problems in his program internally, and the departure or desire to leave of several of his subordinates.

---

[2] Stallings was unable to attend but met with Plaintiff and Defendant later that day and received the same message.

[3] In fact, Plaintiff states that under DEP guidelines, a letter of concern is not officially considered "disciplinary action."

### B. *Incidents Prior to 2012*

Although Plaintiff generally received satisfactory reviews prior to Creech's arrival as Director of the Southeast District in May of 2011 and received several awards (e.g., employee of the month), Plaintiff was involved in several incidents regarding his performance.

In August 2010, after then-Director Jack Long and Assistant Director Claridge confronted Plaintiff about having encountered one of Plaintiff's subordinates sleeping at his desk, Long objected to the tone of Plaintiff's e-mail response. Response Ex. 3-F1 [ECF No. 73-3, at 4]. In October 2010, Long expressed disappointment in Plaintiff's handling of a "sensitive" permit request because Plaintiff failed to talk to Long first as requested. Response Ex. 3-F2 [ECF No. 72-3, at 7]. Long also commented on Plaintiff's lack of judgment in sending an e-mail.[4] Finally, in April of 2011, Claridge told Plaintiff that he found a comment in an e-mail he wrote to a departing employee to be "sarcasm, unnecessary, and unproductive," and Jessica Cherry stated that she found the comment "rude, condescending and . . . unnecessary." Response Ex. 3-F3 [ECF No. 73-3, at 8-9].

In September 2011, shortly after Defendant was appointed as Director of the Southeast District, she placed Plaintiff on a performance improvement plan to address his interpersonal and communication skills. At that time she also encouraged Plaintiff to consider other employment options that would emphasize technical over soft skills. After a few months, Plaintiff was removed from the improvement plan. Response Ex. 4, ¶ 5 [ECF No. 72-4].

---

[4]The e-mail was sent at 8:06 a.m. on October 7, 2010 to someone called Cindy Phillips, but no other details appear in the record.

5

### C. *The Instant Lawsuit and Motion for Summary Judgment*

Shortly after Plaintiff was terminated, he commenced this action arguing that his termination was impermissibly motivated by racial bias in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution. Plaintiff originally sued the Florida DEP but subsequently amended his claim to name Jill Creech individually as the sole defendant. Plaintiff sues under 42 U.S.C. § 1983, which provides a monetary remedy to an individual who has been deprived of a constitutional right by someone acting under color of law. Defendant then filed the instant Motion for Summary Judgment arguing that she is entitled to qualified immunity and that Plaintiff has failed to state a claim for a constitutional violation.

## II.  JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as it is an action arising under the Constitution of the United States. Venue is proper because the acts underlying Plaintiff's claims took place in this district. 28 U.S.C. § 1391(b)(2).

## III.  DISCUSSION

Summary judgment is warranted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In determining whether summary judgment is appropriate, facts and inferences from the record are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to

establish both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *See Matsuhita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Defendant argues that she is entitled to summary judgment based on the doctrine of qualified immunity. Qualified immunity offers "protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002). Thus, the first step in evaluating an assertion of qualified immunity is to determine whether the defendant is a public official who was acting within the scope of her discretionary authority in performing the allegedly wrongful acts. *Id.* at 1194. If the defendant makes this showing, the burden shifts to the plaintiff to show that the defendant (a) deprived him of a constitution right and (b) that the right was clearly established at the time of the violation. *Id.*

In the instant case, the parties do not dispute that the threshold requirement—i.e., that Defendant is a public official who acted within the scope of her authority in firing Plaintiff—is met. The question therefore becomes whether Plaintiff can show that Defendant deprived him of a constitutionally protected right that was clearly established at the time.

The constitutional right Plaintiff asserts is his Fourteenth Amendment right to be free from racially-based employment discrimination. To prove employment discrimination under the Equal Protection Clause, a plaintiff must show either *direct* evidence of discrimination or *circumstantial* evidence under the *McDonnell-Douglas* analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Court has previously determined that Plaintiff had not alleged direct evidence of

7

discrimination, *see* Order Granting Def.'s Mot. Dismiss [ECF No. 59], and Plaintiff has not added any new allegations that would serve as direct evidence. The Court will therefore evaluate whether Plaintiff's amended pleadings allege circumstantial evidence of discrimination.

Under *McDonnell-Douglas*, a plaintiff must show that (a) he is a member of a protected class, (b) he was subjected to an adverse employment action, (c) he was qualified for the job, and (d) the employer treated similarly-situated employees outside of the protected group more favorably. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319 (11th Cir. 2006). Then the burden shifts to the defendant to show a legitimate, non-discriminatory justification for its treatment of the plaintiff, and then, if it does so, the burden shifts back to the plaintiff to prove that the defendant's justification is merely a pretext for discrimination. *Id.*

For the purposes of the instant motion, Defendant concedes all but the last prong of the prima facie case—i.e., whether Plaintiff can show that Defendant treated similarly-situated employees outside of his racial group more favorably. Plaintiff has attempted to meet this requirement by pointing to three fellow supervisors who, he asserts, are valid comparators. Before turning to these individuals, the Court notes that, to be a valid comparator, the person must have engaged in "nearly identical" conduct to the conduct that precipitated the plaintiff's adverse employment action. *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) ("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."). If "[n]on-discriminatory differences just as readily explain the difference in treatment," which is to say if the Plaintiff and the proffered comparators were treated differently because the employer believed they did, in fact,

engage in different conduct, no inference of discrimination is created. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1186-87 (11th Cir. 1984) (citing *Chescheir v. Liberty Mut. Ins. Co.*, 713 F.2d 1142, 1148 (5th Cir. 1983). Although the "nearly identical" standard is often difficult to meet, absent "conduct [that is] so unfairly discriminatory that no reasonable person would find it non-actionable," Plaintiff must meet this standard in order to establish a prima facie case. *McCann v. Tillman*, 526 F.3d 1370, 1374 n.4 (11th Cir. 2008).

### A.   *Relevant Conduct*

It is equally important to identify the relevant conduct that serves as the basis for comparison between Plaintiff and the proffered comparators. In a typical employment discrimination case, the plaintiff/employee who was terminated or suffered an adverse employment action will point to other employees of a different race who engaged in the same conduct as the plaintiff/employee but received less severe discipline. Quite often, the complained of conduct is a discrete, easily-identified incident. In the case at bar, however, Defendant asserts that Plaintiff was terminated for an overall assessment of deficient management skills. Competent leadership is a critical component for any organization and the Court fully recognizes that "[a]n employer's decision may properly be based on subjective factors," *Allison v. W. Union Tele. Co.*, 680 F.2d 1318, 1322 (11th Cir. 1982), and that "[a]bsent evidence that [the] subjective . . . criteria were used as a mask for discrimination," these decisions will be upheld. *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001). As the Eleventh Circuit explained in *Chapman v. AI Transport*,

> [S]ubjective evaluations of a job candidate are often critical to the decision making process, and if anything, are becoming more so in our increasingly service-oriented economy. . . . Personal qualities also factor heavily into employment decisions concerning supervisory or professional positions. Traits such as common sense, good

9

>judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position.

229 F.3d 1012, 1033-34 (11th Cir. 2000) (internal quotations and citations omitted). Thus, to avoid second guessing an employer's permissible business decisions by "confusing apples with oranges," it is especially crucial for Plaintiff in the instant case to show valid comparators who engaged in "nearly identical conduct" as Plaintiff. *Mannicia*, 171 F.3d at 1368; *see also Burke-Fowler*, 447 F.3d at 1322 n.2. In attempting to identify suitable comparators, courts have drawn distinctions based on the quantity and quality of the alleged misconduct, *Mannicia*, 171 F.3d at 1369, and various other significant details of the comparators' characteristics. *See, e.g.*, *Burke-Fowler*, 447 F.3d at 1325 (the plaintiff "pursued a romantic relationship with an incarcerated person shortly after he left her direct supervision," while the comparators "had relationships with people who subsequently became incarcerated"); *Chapman*, 229 F.3d at 1035 (distinguishing the plaintiff from other interview candidates on the basis of the employer's subjective opinion that the other candidates offered "sharper" answers, gave a better presentation of their work histories, and took a more "aggressive approach in asking . . . questions about the position").

While allowing for subjective criteria, the Eleventh Circuit has held that an employer's explanation of its reasoning "'must be clear and reasonably specific.'" *Chapman*, 229 F.3d at 1034 (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)). The specific explanation articulated by Defendant of the essential factors contributing to Plaintiff's termination were that she had to intervene to address problems in Plaintiff's program, that employees were leaving his program, that he had previously had issues regarding his management, and that his

10

employees had complained to Tallahassee and that the ensuring investigation revealed that management problems existed. *See* 2d Am. Compl. Ex. 84, 2-3 [ECF No. 67-4, at 14-15]; Motion, Ex. 4, ¶¶ 4, 11-12 [ECF No. 72-4].

As an initial matter, Defendant has suggested that valid comparators be limited to program administrators or others with an equivalent position in the DEP hierarchy. The Court rejects this criterion as too narrow and, instead, will consider whether a proffered comparator exercised a level of supervisory authority similar to that held by the Plaintiff. *See Lathem v. Dept. of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles . . . .").

Also, while Defendant in her termination rationale cited the fact that Plaintiff had been the subject of complaints to Tallahassee, the Court views the substantive issue to be whether the complaints were indicative of valid underlying management problems. *See* Motion, Ex. 4, ¶¶ 11 [ECF No. 72-4] ("Mr. Wilson's office had conducted an investigation which substantiated the existence of management problems in [Plaintiff's] program . . . .").

The record evidences the following history of problems with Plaintiff's management style: (a) Plaintiff's previous supervisors had criticized his management style; (b) Defendant had previously placed Plaintiff on a performance improvement plan relating to his management and leadership skills; (c) the central human resources office in Tallahassee had conducted a preliminary investigation and confirmed there were problems with Plaintiff's management style; and (d) Plaintiff's management style had caused discord within his program. Against the record background, the Court will now evaluate whether the proffered comparators have sufficiently similar conduct that

more favorable treatment would create an inference of discrimination under *McDonnell-Douglas*.

### B.     *Comparators*

Plaintiff's three proposed comparators are Jennifer Smith, a white female program administrator, Paul Wierzbicki, a white male who served as a supervisor of waste cleanup, and John Armstrong, a white male engineering supervisor. Plaintiff emphasizes that, like him, each of the proposed comparators proposed to undertake some form of disciplinary action regarding one or more of their subordinates. The Court, however, has concluded that in focusing on actual or proposed disciplinary actions, Plaintiff has too narrowly focused on one aspect of a manager's responsibility without addressing the legitimacy or necessity for the supervisor's act and without any consideration of the comparators' history of leadership or management problems. Whether a proposed comparator intended to or did discipline a subordinate does not address whether they had leadership or management problems, and this is what Plaintiff is required to show in order to demonstrate "nearly identical" conduct. This is a fatal flaw in Plaintiff's effort to identify valid comparators.

#### 1.  *Jennifer Smith*

Jennifer Smith, a white female, is the Program Administrator of the Environmental Program in the Southeast District. Like Plaintiff, Smith sought to discipline a subordinate by issuing an official reprimand to Rachel Osborne for poor performance and insubordination on February 24, 2012 for being late on seven occasions and for speaking negatively about a superior other than Smith after he had left the room. 2d Am. Compl. Ex. 88 [ECF No. 67-4, at 39]. However, unlike Plaintiff, Smith had not been placed on an improvement plan regarding her management and communication skills. In addition, the central human resources department in Tallahassee had not investigated

Smith's management techniques and conclude that a problem existed that Defendant would have to resolve personally. Finally, while Smith also had a number of her subordinates voluntarily leave her program, ten compared to only five for Plaintiff, Defendant points out that Smith's program included twenty-five employees compared to only nine in Plaintiff's. Thus, when viewed in proportion, there was less reason to believe that Smith's leadership style was causing high turnover among her staff relative to Plaintiff.

Considering the foregoing, the Court concludes that Smith does not qualify as a valid comparator because she did not have the same history of problems with her management style, nor had a finding been reported to Defendant that a current problem existed in Smith's department that Defendant would have to address. Because of this, regardless of whether Smith is comparable in terms of her supervisory authority, personnel movement, or use of disciplinary measures, Smith was not involved in the "nearly identical" conduct required to serve as a valid comparator.

*2. Paul Wierzbicki*

Paul Wierzbicki, a white male, is a Waste Cleanup Supervisor in the Waste Program. As a supervisor, he reports to the Program Administrator and is thus one level below Plaintiff in the DEP hierarchy. Response, Ex. 4, ¶ 8 [ECF No. 72-4]. Wierzbicki apparently contemplated issuing a written reprimand to one of his subordinates based on unprofessional comments to another employee, *see* 2d Am. Compl. Ex. 99 [ECF No. 67-5, at 22], but Defendant points out that this reprimand was never actually issued. Response, Ex. 1, ¶ 4 [ECF No. 72-1]. Regardless whether or not this qualifies as a similarity, Wierzbicki is otherwise distinguishable in that he was never placed

13

on a performance improvement plan regarding his management or communication skills,[5] nor had Tallahassee found a problem between him and his subordinates that would require Defendant's involvement as the director of the Southeast Region. In addition, Defendant argues that a significant distinction can be drawn from disciplinary measures addressing problems between a subordinate and a third party, as in Wierzbicki's case, and the disciplinary measures Plaintiff intended to take to address a problem between his subordinates and himself. Again, considering the totality of Wierzbicki's characteristics, the Court finds that he does not qualify as a valid comparator. He simply did not have the same history of questions regarding his management style or an ongoing issue in his department as Plaintiff did when he was terminated.

### 3. *John Armstrong*

John Armstrong, a white male, is a Professional Engineer Supervisor in the Water Program. Armstrong issued an official reprimand to a subordinate on June 20, 2012 for "conduct unbecoming a public employee." 2d Am. Compl. Ex. 104 [ECF No. 67-5]. In addition, Armstrong was previously put on an a performance improvement plan regarding his "interpersonal skills," and Defendant admits that he had "similar interpersonal difficulties as did [Plaintiff]." Response Ex. 4, ¶ 7 [ECF No. 72-4]. The crucial distinction between Plaintiff and Armstrong is that while Armstrong does have a history of issues regarding his interpersonal skills, there is no indication in the record that his management style caused the level of discord as existed among Plaintiff's

---

[5]Although nothing in the record suggests that Wierzbicki was placed on a performance improvement plan regarding his management skills, Plaintiff does allege that, at the time of Plaintiff's dismissal, both he and Wierzbicki "were on a performance improvement plan designed to improve accountability, efficiency and performance." 2d Am. Compl. ¶ 171 [ECF No. 67]. This allegation is not supported by a citation to any evidence in the record.

14

subordinates. Thus he too fails to qualify as a valid comparator.

### C.  Conclusion

Because Plaintiff has not identified an appropriate comparator, he has failed to establish a prima facie case for employment discrimination, and his claim fails. Of course, the Court takes no position on the wisdom of Defendant's decision to terminate Plaintiff, who had a very long career with the Florida DEP and appears to have been successful at least for a large portion of his tenure there. The Court's role is not to second guess the management decisions of the DEP officials. *See Maniccia*, 171 F.3d at 1368. Rather, the Court can only ask whether Plaintiff has shown that the Defendant's decision was improperly motivated by racial discrimination using the rubric established by case law. Because he has not, the Court must grant Defendant's motion.

While the foregoing is sufficient to justify granting Defendant's motion, the Court notes that even if Plaintiff had established a prima facie case, the burden would merely have shifted to Defendant to "articulate a legitimate, non-discriminatory reason for the challenged employment action." *Morgan v. Orange Cnty., Fla.*, 477 F. App'x 625, 628 (11th Cir. 2012). Without doubt, the rationale articulated by the Defendant and recounted herein—specifically, the continuing issues regarding Plaintiff's management skills—is adequate for this purpose. The burden would then shift back to the plaintiff to "demonstrate that the employer's proffered reason is a pretext" for discriminatory animus. *Id.* "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. Suffice to say that Plaintiff has failed to do this as well. This analysis provides further confirmatory support for the Court's resolution of the instant motion.

Order Granting Defendant's Motion for Summary Judgment
Anderson v. Creech
Case No. 12-cv-80931-DTKH

## IV.  CONCLUSION

In light of the foregoing and keeping in mind that it is appropriate to apply the affirmative defense of qualified immunity "at the earliest possible stage in litigation," the Court will grant Defendant's motion for summary judgment and enter judgment in Defendant's favor.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001) (en banc).

It is hereby **ORDERED** and **ADJUDGED** that:

1.  Defendant's Motion for Summary Judgment [ECF No. 72] is **GRANTED**.

2.  Pursuant to Federal Rule of Civil Procedure 58(a), the Court will enter final judgment in Defendant's favor by separate order.

**DONE** and **SIGNED** in chambers at West Palm Beach, Florida, this 1st day of July, 2013.

Daniel T. K. Hurley
United States District Judge

*Copies provided to counsel of record and all pro se parties*